UNITED STATES, Appellee,

v.

Sergeant Phong T. LE, United States Army, Appellant.

ARMY 20020298.

U.S. Army Court of Criminal Appeals.

6 April 2004.

For Appellant: Captain Kathy J. Martin, JA (argued); Captain Linda A. Chapman, JA; Captain Fansu Ku, JA (on brief); Colonel Robert D. Teetsel, JA; Major Sean S. Park, JA; Captain Fansu Ku, JA (on specified issues); Major Allyson G. Lambert, JA; Captain Jeremy W. Robinson, JA.

For Appellee: Captain Janine P. Felsman, JA (argued); Lieutenant Colonel Margaret B. Baines, JA (on brief); Colonel Lauren B. Leeker, JA; Lieutenant Colonel Margaret B. Baines, JA; Major Natalie A. Kolb, JA; Captain Janine P. Felsman, JA (on specified issues).

Before HARVEY, Senior Judge, BARTO, and SCHENCK, Appellate Military Judges.

## OPINION OF THE COURT

SCHENCK, Judge:

A military judge sitting as a general court-martial convicted appellant, in accordance with his pleas, of desertion and failure to obey a lawful general order (two specifications), in violation of Articles 85 and 92, Uniform Code of Military Justice, 10 U.S.C. §§ 885 and 892 [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for seven months, forfeiture of all pay and allowances, and reduction to Private E1.

In response to this court's specified issues, appellate defense counsel assert that the providence inquiry failed to establish whether the duress defense was available to appellant when appellant stated that he left his unit for nearly fourteen months because he was afraid a gang member would kill or harm

him. Appellate government counsel counter, *inter alia*, that appellant's guilty plea was provident because appellant did not fear immediate injury or death and, in any event, appellant's fear did not continue throughout his absence.

We find that appellant's asserted fear of immediate death or serious bodily injury rendered his guilty plea to Charge I and its Specification improvident for the first four days of his absence. Thereafter, any fear was unreasonable because after four days appellant was no longer near the source of the threat. As such, we hold that appellant's guilty plea is provident to desertion for the remainder of his absence. We will modify Charge I and its Specification to more accurately reflect appellant's culpability and reassess the sentence in our decretal paragraph.

## FACTS

Appellant entered a guilty plea to desertion from on or about 15 September 2000 until apprehension on or about 4 November 2001, as alleged in Charge I and its Specification. During the providence inquiry, appellant stated that his girlfriend's former boyfriend did not want her to date appellant. Her former boyfriend was a gang member who threatened appellant around July or August of 2000 and possibly later. According to appellant, the former boyfriend was "like a gangster" and he "was kind of like going after [appellant]."

Appellant took the threats seriously because he was raised in Los Angeles and saw "a lot of things happen with the gangster people." Moreover, the former boyfriend followed appellant and appellant's girlfriend to various locations, such as the mall and on the freeway. Appellant was afraid of the former boyfriend and told the military judge that his girlfriend was also fearful. On 15 September 2000, appellant packed all his belongings "[b]ecause [he] wasn't planning to come back." He left Fort Lewis, drove to San Diego, California, and was apprehended 415 days later (on 4 November 2001) while crossing the international border at Tijuana, Mexico.

Appellant was informed that his commander was considering the imposition of nonjudicial punishment on the day before his desertion, but appellant said this was not one of the problems that led to his desertion. Instead, appellant twice told the military judge that he left his unit due to the former boyfriend's threats. A short while later, appellant stated that the threats had a "[v]ery serious" impact on his decision to leave.

The military judge then explained the duress defense to appellant.[1] He stated that appellant must have had a reasonable fear and that the "threat resulting in fear must have continued throughout the commission of the offense [ (appellant's desertion) ]." After the military judge's explanation, appellant's trial defense counsel conceded that he had not discussed the duress defense with appellant prior to trial. The military judge, therefore, recessed the court for over twenty minutes to allow counsel time to confer with appellant.

After the recess, appellant answered the military judge's questions, as follows:

> MJ: Well, when you left on 15 September were you fearful that you were going to be immediately killed or would immediately suffer serious bodily injury?
>
> ACC: To my knowledge, I was left pretty much on my own, so I—I don't think it was immediate dangerous [sic] to myself.
>
> MJ: Did you fear immediate danger to your person on September 15th, when you left?
>
> ACC: Sir, I would say—I feared, but I don't know exactly what they are going to do to me, so——
>
> MJ: Well, were you fearful that you would be immediately killed?
>
> ACC: No, sir.
>
> MJ: Were you fearful that you would immediately suffer serious bodily injury?
>
> [Accused and defense counsel conferred.]
>
> ACC: No, sir.

---

1. The military judge provided a standard instruction known as, "Duress (Compulsion or Coercion)," from Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 5–5 (1 Apr. 2001) (unchanged in current 15 Sept. 2002 edition).

Appellant then stated that he "would understand" that he could have reported the threats to the police or chain of command. He explained, however, that if he made a report he thought the former boyfriend and his friends "might com[e] back for [him] later on." The military judge questioned, "Did they ever try to run you off the road with you driving?" Appellant answered, "It was close a couple times." When the military judge asked if appellant had received any threats on 15 September 2000, appellant answered "no" after conferring with his counsel.

The military judge probed further with his questioning:

MJ: So it's clear in my mind, why did you leave on September 15th of 2000?

ACC: Sir, because I don't believe—know when—when they are going to come for me and I was under this stressful [sic] and all the trouble I got myself into because of that. And also, I'm about to leave this country to go to another duty station. I don't have time to go back, see my family or my friends for almost two years. So I was under that stressful [sic] and—and confused and scared.

MJ: What were you scared about?

ACC: I was scared of her ex-boyfriend and the trouble I had gotten myself into.

MJ: What trouble you had gotten yourself into?

ACC: Like have over—guests overnight. All the trouble I got into. And all these things just pile on me at one time.

MJ: Where did your family and friends live, that you wanted to visit before you [transferred] to Korea?

ACC: LA, California, sir.

MJ: What was the primary reason why you left on September 15th of 2000?

ACC: I was scared and——

MJ: What were you scared about?

ACC: Scared I might get hurt or killed sometime before I go, because my report date [for port call to Korea] is October 20th.

MJ: You were scared that you would be hurt or killed; is that what you said?

ACC: Sir——

MJ: Hurt or killed by whom?

ACC: By the guy.

MJ: That was the primary reason you left, was your fear of injury from this guy, the ex-boyfriend?

ACC: Yes, sir.

MJ: Did you believe you would be immediately killed or seriously injured?

ACC: No, sir. But, I wouldn't know, sir.

MJ: You didn't know?

ACC: To my knowledge—immediately, I wouldn't say—I would say no. But I don't know when he's going to come from [sic]. He can come in from—at any time he wanted to, sir.

MJ: Well, how long were you gone from the Army?

ACC: Sir, fourteen months, sir.

MJ: So from 15 September [2000] until when?

ACC: Until November 4th, 2001, sir.

MJ: During that entire time frame were you fearful that if you returned to Fort Lewis this ex-boyfriend would kill or injure you?

ACC: I was, sir.

MJ: You were? Throughout that whole time frame?

ACC: To a point—sometime[s] I might forget it. But, like when I was there—like, a few months, I was kind of fearful, but later on—sometime later on, I might forget about that stuff, sir.

MJ: During your absence—I understand that you might not be thinking about it throughout, but during your absence, did there ever come a time when you no longer thought that you might be killed or injured if you returned to Fort Lewis? In other words, you have left the Army, maybe when you thought, "Maybe I should return to the Army," is the thing that prevented you from returning that fear that you would be killed or injured by this ex-boyfriend?

ACC: I'd say it was, sir, because I don't know what he [was] going to do when I run through [sic] him again, sir.

Upon the conclusion of this questioning, and in response to the military judge's inquiry, trial counsel argued that the military judge could accept appellant's guilty plea. Counsel explained, *inter alia,* that appellant's fear was not immediate or continuous throughout the absence. Near the end of the providence inquiry, the military judge again asked appellant if he left Fort Lewis on 15 September 2000 because he was fearful of being killed immediately, or fearful of suffering immediate serious bodily injury. After conferring with his counsel, appellant responded "no" to each question. When the military judge asked appellant if he had fear of immediate death or serious bodily injury at any time during his subsequent absence from Fort Lewis, appellant responded "no." Trial defense counsel argued that appellant's concessions rendered the duress defense unavailable.

Throughout the providence inquiry, the military judge never explained to appellant the temporal term, "immediate." *See United States v. Jemmings,* 1 M.J. 414, 418 (C.M.A. 1976) (finding that appellant did not "satisfactorily disclaim[ ] the duress defense" where appellant admitted that threat of grievous bodily harm may not have occurred " 'that night'," that is, on the night of appellant's crime).

## DISCUSSION

We review a military judge's acceptance of a guilty plea for an abuse of discretion. *United States v. Eberle,* 44 M.J. 374, 375 (C.A.A.F.1996). We will overturn a military judge's acceptance of a guilty plea only if the record of trial shows a substantial basis in law and fact for questioning the plea. *United States v. Jordan,* 57 M.J. 236, 238 (C.A.A.F.2002) (citing *United States v. Prater,* 32 M.J. 433, 436 (C.M.A.1991)); *United States v. Bickley,* 50 M.J. 93, 94 (C.A.A.F. 1999).

Before accepting a plea of guilty, a military judge must conduct a thorough inquiry to ensure the accused understands the meaning and effect of the plea, that he enters it voluntarily, and that he is, in fact, guilty of the offense.[2] In so doing, the military judge must explain the elements of the offense to the accused, elicit a factual basis for the offense from the accused, and ensure that the accused fully understands the nature of the offense to which he is pleading guilty. *United States v. Peele,* 46 M.J. 866, 868 (Army Ct.Crim.App.1997) (citing *Davenport,* 9 M.J. at 366; *Care,* 18 U.S.C.M.A. at 541, 40 C.M.R. at 253). The facts disclosed by such inquiry must objectively support the guilty plea. *Garcia,* 44 M.J. at 497–98. "Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea." *United States v. Outhier,* 45 M.J. 326, 331 (C.A.A.F.1996).

If at any point in the proceedings the accused raises a matter inconsistent with the guilty pleas, the military judge must inquire further into the providence of the pleas and either *resolve the apparent inconsistency or reject the guilty pleas.*[3] When inconsistent matters "reasonably raise[ ] the question of a defense ... it [is] incumbent upon the military judge to make a more searching inquiry to determine the accused's position on the apparent inconsistency with his plea of guilty." *Timmins,* 21 U.S.C.M.A. at 479, 45 C.M.R. at 253. The military judge "should not accept the plea unless the accused admits facts which negate the defense." R.C.M. 910(e) discussion. In our analysis of whether the providence inquiry contains facts inconsistent with the guilty plea, we accept the accused's version of the facts "at face value." *Jemmings,* 1 M.J. at 418.

Article 85, UCMJ, provides, "Any member of the armed forces who, without authority ... remains absent from his [or her] unit, organization, or place of duty with

2. *See Jordan,* 57 M.J. at 238 (citing UCMJ art. 45, 10 U.S.C. § 845); *United States v. Davenport,* 9 M.J. 364, 367 (C.M.A.1980); *United States v. Care,* 18 U.S.C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969); Rule for Courts–Martial [hereinafter R.C.M.] 910(e).

3. *United States v. Garcia,* 44 M.J. 496, 498 (C.A.A.F.1996) (citing UCMJ art. 45(a); R.C.M. 910(h)(2)); *see also Davenport,* 9 M.J. at 367; *United States v. Timmins,* 21 U.S.C.M.A. 475, 479, 45 C.M.R. 249, 253, 1972 WL 14168 (1972); *United States v. Vaughn,* 36 M.J. 645, 647 (A.C.M.R.1992).

intent to remain away therefrom permanently ... is guilty of desertion." The elements of this offense are:

(a) That the accused absented himself or herself from his or her unit, organization, or place of duty;

(b) That such absence was without authority;

(c) That the accused, at the time the absence began or at some time during the absence, intended to remain away from his or her unit, organization, or place of duty permanently; and

(d) That the accused remained absent until the date alleged.

*Manual for Courts–Martial, United States* (2000 ed.) [hereinafter *MCM*, 2000], Part IV, para. 9b(1). Termination by apprehension, as an aggravating factor, must also be proven beyond a reasonable doubt. *See id.*

Our superior court has explained the duress defense as follows:

'Except when he kills an innocent person, a person cannot properly be convicted for committing an act for which he would otherwise be criminally responsible if his participation in it is caused by the degree of coercion or duress recognized in law as a defense. This degree of coercion or duress is a reasonably grounded fear on the part of the actor that he would be immediately killed or would immediately suffer serious bodily injury if he did not commit the act. The fear compelling the act must be of immediate death or serious bodily injury and not of an injury in the future or of an injury to reputation or property. *The threat must continue throughout the perpetration of the act.* If the accused has a reasonable opportunity to avoid committing the act without subjecting himself to the threatened danger, his act is not excusable.' (Emphasis added.)

*United States v. DeHart,* 33 M.J. 58, 61–62 (C.M.A.1991) (quoting *MCM,* 1969 (Rev. ed.), para. 216f) (some emphasis omitted).

R.C.M. 916(h) explains the duress defense as follows:

It is a defense to any offense except killing an innocent person that the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act. *The apprehension must reasonably continue throughout the commission of the act.* If the accused has any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened, this defense shall not apply.

(Emphasis added.) *See United States v. Washington,* 57 M.J. 394, 397 (C.A.A.F.2002) (discussing duress defense in military and R.C.M. 916(h)).

Moreover, the duress defense has long been applied to military offenses. *See, e.g., United States v. Hullum,* 15 M.J. 261, 267–68 (C.M.A.1983) (finding ineffective assistance of appellate counsel because issues of racial harassment and death threats not raised or argued on sentence appropriateness); *United States v. Roby,* 23 U.S.C.M.A. 295, 49 C.M.R. 544, 1975 WL 15877 (1975) (setting aside guilty plea to four-month absence without leave (AWOL) because duress defense reasonably raised during providence inquiry); *United States v. Pinkston,* 18 U.S.C.M.A. 261, 39 C.M.R. 261, 1969 WL 5966 (1969) (setting aside guilty plea to larceny and wrongful appropriation because duress defense raised during presentencing); *United States v. Fleming,* 7 U.S.C.M.A. 543, 558–61, 23 C.M.R. 7, 22–25, 1957 WL 4422 (1957) (discussing history of military duress defense and holding that defense is "only available under a reasonably grounded fear of immediate death or great bodily harm"); *see generally* COLONEL WILLIAM WINTHROP, WINTHROP'S MILITARY LAW AND PRECEDENTS [hereinafter WINTHROP'S] 297 & 642 (2d ed. reprint 1920) (1896) (discussing duress defense).

Although the duress defense may apply in various situations, the Supreme Court has limited its applicability in certain circumstances, stating:

[W]here a criminal defendant is charged

with escape [4] and claims that he is entitled to an instruction on the theory of duress or necessity, he must proffer evidence of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity ha[s] lost its coercive force.

*Bailey,* 444 U.S. at 415, 100 S.Ct. 624. The *Bailey* Court found that duress was unavailable, despite respondent Bailey's statement that he did not turn himself in after escaping from the D.C. jail because he "would still be under the threats of death." *Id.* at 399, 100 S.Ct. 624. Similarly, co-respondent Walker stated that he called the Federal Bureau of Investigation, but they were "unable to promise that Walker would not be returned to the D.C. jail." *Id.* In *Bailey,* the court held that an escapee must "either surrender[ ] or offer[ ] to surrender at [the] earliest possible opportunity." *Id.* at 415, 100 S.Ct. 624. This requirement is an "indispensable element of the defense of duress or necessity." *Id.*

In the present case, appellant has provided sufficient facts to raise the duress defense for his initial departure from his unit. We acknowledge that the military judge explained the duress defense and that a recess followed, during which time trial defense counsel discussed the defense with his client. The subsequent colloquy on the record, however, did not resolve this issue satisfactorily. *See Garcia,* 44 M.J. at 498; *United States v. Palus,* 13 M.J. 179, 180 (C.M.A.1982) (reversing conviction where military judge did not resolve potential duress defense before accepting guilty plea). Instead, trial counsel, trial defense counsel, and the military judge merely agreed that the defense was inapplicable.

In *United States v. Biscoe,* 47 M.J. 398, 403 (C.A.A.F.1998), our superior court held that Second Lieutenant Biscoe's guilty plea to AWOL was provident, noting that her "guilty-plea responses clearly impl[ied] that she did not reasonably fear death or serious bodily injury for herself or her family as a result of her alleged sexual harassment." The facts in appellant's case, however, are distinguishable from *Biscoe* because appellant's providence inquiry lacked factual support to negate the duress defense.

Despite trial defense counsel's assertions, appellant's guilty plea responses "clearly imply" that appellant "reasonably fear[ed immediate] death or serious bodily injury" to himself from the former boyfriend when appellant left for California on 15 September 2000. *Id.* In cases such as appellant's, we agree with Judge Trant's observation in *United States v. Pecard:* "The spectacle, where both counsel take hold of appellant's arms while the judge grabs the ankles and together they drag appellant across the providence finish line, is not only troublesome, but, as demonstrated by the result in this appeal, in the end, futile." ARMY 9701940, slip op. at 8 (Army Ct.Crim.App. 7 Dec. 2000) (unpub.) (reversing AWOL and desertion convictions because issue of mental responsibility unresolved during providence inquiry).

The military judge did not "sufficiently elicit the [factual] responses necessary to conclude that [appellant's] plea [was] provident" [5] and to negate the duress defense. We are satisfied, however, that once appellant left the vicinity of Fort Lewis, Washington, his apprehension of immediate death or serious bodily injury was no longer reasonable. Presumably, appellant arrived in San Diego, California, after an estimated four

---

4. The offense of "escape from federal custody as defined in [18 U.S.C.] § 751(a) is a continuing offense and ... an escapee can be held liable for failure to return to custody as well as for his initial departure." *United States v. Bailey,* 444 U.S. 394, 413, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Similarly, the military offense of desertion "continues" throughout the period of the absence until the " 'deserter's apprehension or voluntary return'," *United States v. Welsh,* 33 C.M.R. 502, 504, 1963 WL 4898 (A.B.R.1963) (quoting WINTHROP's at 255), and criminal liability is "complete" when the accused absents himself without authority from his unit "with the intent to remain away therefrom permanently." UCMJ art. 85c(1)(a), 10 U.S.C. § 885c(1)(a); *see, e.g., United States v. Salter,* 20 M.J. 116, 117 (C.M.A. 1985). Additionally, under certain circumstances the statute of limitations is tolled during the unauthorized absence. UCMJ art. 43(c), 10 U.S.C. § 843(c); *see United States v. Miller,* 38 M.J. 121, 122 (C.M.A.1993); *United States v. Jackson,* 20 M.J. 83, 84 (C.M.A.1985); *Bailey,* 444 U.S. at 413–14, 100 S.Ct. 624.

5. *Jemmings,* 1 M.J. at 418.

days of travel.[6] Once he was away from the Fort Lewis area, appellant's claimed duress "lost its coercive force." *Bailey*, 444 U.S. at 415, 100 S.Ct. 624. At this point, appellant could have safely turned himself in to military or civilian authorities, thereby terminating his unauthorized absence. *See United States v. Rogers*, 59 M.J. 584 (Army Ct.Crim. App.2003) (discussing voluntary termination of AWOL); *United States v. Ward*, 48 C.M.R. 554, 1974 WL 13856 (A.C.M.R.1974) (discussing voluntary surrender to civilian police). As such, any "reasonably grounded" fear of immediate death or serious bodily injury had ended. His intent to remain away permanently was thereafter unexcused,[7] and appellant's plea of guilty was provident to desertion for that period of time after he arrived at a safe place. We will give appellant the benefit of any doubt and modify the findings by shortening the period of his absence by four days.

## CONCLUSION

We have considered the matters asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The court affirms only so much of the findings of guilty of Charge I and its Specification, as finds that appellant did, on or about 19 September 2000, without authority and with intent to remain away therefrom permanently, absent himself from his unit, to wit: 24th Quartermaster Supply Company, located at Fort Lewis, Washington, and did remain so absent in desertion until he was apprehended on or about 4 November 2001, in violation of Article 85, UCMJ. The remaining findings of guilty are affirmed. Reassessing the sentence based on the error noted, the entire record, and applying the principles of *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the court affirms the sentence.

Senior Judge HARVEY and Judge BARTO concur.

6. *See* Joint Federal Travel Reg., Vol. 1, Uniformed Service Members, § U3005, para. C (1 Jan. 04), http://www.dtic.mil/perdiem/jftr/jftr-c3.txt (authorizing four travel days for vehicular travel from Fort Lewis, Washington, to San Diego, California, which is 1,224 miles).

7. *Cf. MCM*, 2000, Part IV, para. 9c(1)(c)(i) ("The intent to remain away permanently from the unit, organization, or place of duty may be formed [at] any time during the unauthorized absence.").